IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Senior Judge Wiley Y. Daniel**

Civil Action No. 13-cv-01113-WYD-KLM

ERIC ADAM KISSKALT,

      Plaintiff,

v.

ADAM FOWLER, in his individual capacity,

      Defendant.

---

## ORDER ON SUMMARY JUDGMENT

---

I.    <u>INTRODUCTION</u>

THIS MATTER is before the Court on Defendant Adam Fowler's ["Officer Fowler"] Combined Motion for Summary Judgment and Memorandum Brief in Support Thereof filed May 21, 2014.  Officer Fowler asserts that he is entitled to qualified immunity on Plaintiff Eric Adam Kisskalt's ["Kisskalt"] claim against him for excessive force in violation of the Fourth Amendment under 42 U.S.C. § 1983.  A response to the motion was filed on June 19, 2014, and a reply was filed on July 7, 2014.  Thus, the motion is fully briefed.  For the reasons discussed below, the Motion for Summary Judgment is granted.

II.    <u>FACTUAL BACKGROUND</u>

I note at the outset that I will cite to the evidence only where there is a genuine dispute about the fact(s) or where I otherwise deem it appropriate.  Officer Fowler's exhibits are referenced by letter, *e.g.,* Exhibit A,  and Kisskalt's exhibits are referenced

by number, *e.g.*, Exhibit 1.  Where Kisskalt has stated he has insufficient information to

admit or deny facts alleged by Officer Fowler, I will deem these facts undisputed.  *See*

Fed. R. Civ. P. 56(e)(2) (a party opposing summary judgment "may not merely rely on

allegations or denials in its own pleadings; rather, its response must—by affidavits or

otherwise provided in the rule—set out specific facts showing a genuine issue for trial").

Moreover, to the extent Kisskalt has made conclusory allegations that are unsupported

by evidence, this does not create a genuine issue of fact.  *See Annett v. Univ. of*

*Kansas*, 371 F.3d 1233, 1237 (10th Cir. 2004).

On May 14, 2011, at approximately 12:25 a.m., Sergeant Todd Dobbs ["Sergeant

Dobbs"] contacted Kisskalt and his wife for speeding.  Sergeant Dobbs advised Officer

Fowler that he suspected that Kisskalt, the driver of the vehicle, was under the influence

of alcohol.  (*See* Affidavit of Officer Fowler, Ex. A ["Fowler Aff."], ¶ 2.)  Accordingly,

Officer Fowler responded to his location to assist in a possible DUI investigation.  (*Id.*)

Officer Fowler arrived on scene and contacted Kisskalt, who admitted to consuming

alcohol prior to driving his vehicle.

Officer Fowler testified that he observed Kisskalt's speech to be slurred, his eyes

were glassy and watery in appearance, and Officer Fowler detected an odor of alcohol

coming from Kisskalt.  (Fowler Aff., ¶ 5.)  Officer Fowler testified that in light of the

totality of his observations, including Kisskalt's behavior, indicia of intoxication,

performance during voluntary maneuvers that Kisskalt was asked to perform, and a

portable breath test which had a result of .107 BRac, Kisskalt was arrested for Driving

Under the Influence of Alcohol.  (Fowler Aff., ¶¶ 6-10.)  Throughout the arrest, Kisskalt

was cooperative and did not cause problems or in any way threaten Officer Fowler or any other officer.

Officer Fowler handcuffed Kisskalt behind his back, and testified that he ensured that the handcuffs were double locked to prevent the handcuffs from becoming too tight. (Fowler Aff., ¶ 10.)  Officer Fowler also testified that he checked to make sure there was a finger space between the handcuffs and Kisskalt's wrist.  (*Id.*, ¶ 11; *see also* Ex. A-1—photograph of Kisskalt's wrists in handcuffs.)  Kisskalt denies the above allegations regarding the handcuffs, asserting that the handcuffs were too tight and/or improperly applied.  The photo exhibit shows and Kisskalt testified in his deposition that Officer Fowler "wedged his finger in order to get it there in between my wrist and the cuffs" (Ex. 1, Kisskalt Dep. 120:4-21; Ex. 5).  He asserts that the injuries occurred, however, on the sides of the wrist, and that while there may have been space on top and on the bottom of the cuffs, there is no way Officer Fowler could have wedged his finger into the sides of the handcuffs as they were digging into Kisskalt's wrists.  (*Id.*)  Officer Fowler asserts in reply and I agree that Kisskalt cites to no evidence to support the assertions in the previous sentence or to refute Officer Fowler's testimony.  Instead, this is argument of counsel which is insufficient to create disputed facts.  *See Annette*, 371 F.3d at 1237.  Thus, regardless of whether Officer Fowler "wedged" his finger in between the handcuffs and Kisskalt's wrists, it is undisputed that he ensured the handcuffs were double locked to prevent the handcuffs from becoming too tight and ensured that there was a finger space between the handcuffs and Kisskalt's wrist.

After handcuffing Kisskalt, Officer Fowler placed him in the back of his patrol vehicle.  Kisskalt did not immediately complain about the tightness of the handcuffs (Fowler Aff., ¶ 10; Ex. B, Kisskalt Dep. at 80:19-22), nor did he complain about pain. (Fowler Aff., *id*.)  Kisskalt complained about the handcuffs approximately five minutes later when Officer Fowler returned to his squad car to buckle Kisskalt's seatbelt before they left the scene.  (Ex. 1, Kisskalt Dep. 80:19-81:9;  Ex. 2, Fowler Dep. 44:3-17.)

Officer Fowler testified that this first complaint was made as he began to transport Kisskalt to the police department.  Kisskalt asserts, on the other hand, that the complaint occurred before Officer Fowler left the scene of the initial traffic stop. Specifically, Kisskalt testified as follows with regard to the timing and content of his complaint:

> Q.  And, in fact, the first time that you made a complaint about the hand cuffs being too tight was when you were placed inside the patrol vehicle; correct?
> A.  That's correct.
> Q.  Was the vehicle stationary or en route to the police department at the time you first made your complaint?
> A.  It was stationary.
> Q.  So if Officer Fowler put in his report that the first time you complained about handcuffs being too tight was when the vehicle was actually en route to the police department, you would dispute that.
> A.  I would dispute that
> …
> Q.  And when you make your complaint to Officer Fowler about the handcuffs, what is it exactly that you said to him?
> A.  I informed him that I was experiencing pain in my wrists and I felt like the circulation was being cut off from my hands.  I asked him if he could loosen the handcuffs so I could have a little comfort.
> Q.  And what was his response?
> A.  He said, Have you ever been in handcuffs before?
> Q.  And did you answer him?
> A.  I did.  I said, No, sir.

Q.  And what did he say, if anything?
A.  He said, That's what it feels like.

(Ex. 1, Kisskalt Dep. at 80:23-81:9; 83:19-84:9.)

Kisskalt asserts that his complaint was made while Sergeant Dobbs was still on the scene, and while Officer Fowler had the cover of another officer.  The evidence Kisskalt cites from Officer Fowler's deposition does not, however, support this assertion. (*See* Ex. 2, Fowler Dep. 47:23-48:19.)  Officer Fowler testified that Sergeant Dobbs was not available at that time because he was waiting with Kisskalt's wife, and he did not know how long it would take for another officer to arrive on scene because it was around 12:50 a.m. by that time  (Fowler Aff., ¶ 18.)  Moreover, Kisskalt also testified in his deposition that Sergeant Dobbs was not present or in the vicinity when he made the complaint.  (Ex. 2, Kisskalt Dep. at 82:10-19.)  This is significant as Officer Fowler testified that he would have re-cuffed Kisskalt after his complaint had Sergeant Dobbs been standing by, because at that point he would have "had a cover car" and "another cover officer there to take him out and uncuff him."  (Ex. 2, Fowler Dep. at 48:3-12.) Officer Fowler admitted he would have re-cuffed Kisskalt because when someone is complaining about their hands going numb, he would want to make sure their hands do not go numb and they are not seriously injured.  (*Id.* at 48:13–19; *see also* 76:22-77:18.)

Officer Fowler testified that he instructed Kisskalt to place his hands in the indentation of the back of the seat to avoid potential discomfort, and placed a seatbelt over him for transport to the Lafayette Police Department.  (Fowler Aff., ¶ 12; Ex. B,

Kisskalt Dep. at 80:9-15; 84:13-85:1.)[1]  After Kisskalt was placed in the patrol car,

Officer Fowler spoke briefly to Sergeant Dobbs.  Kisskalt was in handcuffs on scene for

no more than five minutes.  (See Fowler Aff., ¶¶ 13-14; Ex. B, Kisskalt Dep. at 83:14-21;

85:4-7).

 Officer Fowler testified, based on his training and experience, that handcuffs are

not comfortable, and that he did not believe "Kisskalt's comment to be a complaint of

pain not otherwise associated with handcuffs."  (Fowler Aff., ¶ 16.)  Thus, he did not

believe that Kisskalt's handcuffs needed to be adjusted at that time, particularly as he

knew that they would arrive at the police department within minutes.  (*Id.*)  Accordingly,

Officer Fowler did not re-apply Kisskalt's handcuffs or check to make sure they were

properly applied.

Kisskalt asserts that Officer Fowler is trained to recheck handcuffs, if not re-cuff

them, when a suspect is complaining that his or her handcuffs are too tight and should

have done so in this instance.  Indeed, Officer Fowler, Sergeant Friese, and Sergeant

Dobbs of the Lafayette Police Department are all trained to recheck and possibly re-

handcuff suspects "at the early convenience" after there is a complaint that

handcuffs are too tight.  (Ex. 3, Friese Dep at 25:1-10; Ex. 4, Dobbs Dep. at 23:6-14,

34:6-12.)  Further, Officer Fowler admits that handcuffs are not used for pain

compliance, but for the safety of police officers and suspects themselves.

---

[1] While Kisskalt denies the facts in the previous sentence, Kisskalt admitted in his deposition that he was told there was an indentation that he could place his hands in behind him, and that he utilized this indentation.  (Ex. 1, Kisskalt Dep. at 80:13-18.)  Further, he admitted that Officer Fowler fastened his seatbelt before leaving the scene for the police station.  Thus, there are no disputed facts regarding this issue.

During the drive to the police department, Kisskalt advised Officer Fowler for a second time that his handcuffs were causing him pain and his hands were going numb (Ex. 1, Kisskalt Dep. at 85:13-28); accordingly, he disputes Officer Fowler's assertion that Kisskalt "made a single comment". In response to this comment, Officer Fowler explained that they would be at the police department very soon (in about two minutes) and they he would remove the handcuffs at that time. (Fowler Aff., ¶ 18; Ex. B, Kisskalt Dep. at 85:22-23.)[2] Officer Fowler testified that it would have taken longer to pull over, request and wait for a cover officer, and then check Kisskalt's handcuffs than the time it would have taken to continue to the police department and safely remove Kisskalt's handcuffs in the holding room. (Fowler Aff., ¶¶ 17-18.) Officer Fowler also testified that for officer safety reasons pursuant to his training, he could not pull over the patrol vehicle and re-check Kisskalt's handcuffs without calling for officer back up.

The location of Kisskalt's traffic stop was less than one mile away from the Lafayette Police Department. It took less than three minutes to travel from the scene to the police department.

Upon arrival at the police department, Officer Fowler intended to remove Kisskalt's handcuffs immediately. However, Kisskalt refused to allow Officer Fowler to remove the handcuffs. Instead, he asked him that photographs be taken of his hands. (Fowler Aff., ¶¶ 20-21; Ex. B, Kisskalt Dep. at 87:13-20.) Thus, Kisskalt remained in handcuffs at the police department for a longer period of time at his request. (Fowler

---

[2] While Kisskalt denies this allegation and states that he was not sure how long the ride would take, it is undisputed that Officer Fowler advised Kisskalt they would be at the police department in approximately two minutes. Whether or not Kisskalt knew how long the ride would take is immaterial.

Aff., ¶¶ 20-21; Ex. B, Kisskalt Dep. at 87:21-23; 88:5-13.)[3]  It took four minutes for Officer Fowler to locate another officer, take photographs and then remove Kisskalt's handcuffs.  (Ex. B, Kisskalt Dep. at 104:19-106:14.)

When taking the photographs, Officer Fowler was still able to insert a finger in between Kisskalt's wrist and the handcuffs.  (Fowler Aff., ¶ 11; Ex. A-1—photograph; *see also* Ex. B, Kisskalt Dep. at 93:6-21—admitting that he recalled Officer Fowler slipping his finger between the handcuffs and his wrists and a photograph being taken.) While Kisskalt again asserts that Officer Fowler had to "wedge" his finger in (Ex. 5; Ex. 1, Kisskalt Dep. at 120:11-17), he cites no evidence to contradict the fact that Officer Fowler was able to insert a finger in between Kisskalt's wrist and the handcuffs.

In total, Kisskalt admits that from the time Officer Fowler handcuffed him until the handcuffs were removed, he was in handcuffs for no more than ten minutes.  At least four minutes of this was because of Fowler's request to remain in handcuffs.  (Ex. B, Kisskalt Dep. at 106:11-14.)

When the handcuffs were removed, Kisskalt's wrists had red indentations typically associated with being placed in handcuffs.  His fingers were not discolored. Officer Fowler testified that these red marks are not uncommon and did not look different than other arrestee's hands.  (Fowler Aff., ¶ 22; Ex. A-2—photograph of

---

[3] In response, while Kisskalt admits he requested to have photographs taken of his wrist while he was handcuffed, he denies that he was in the handcuffs because he wanted to be there or that he did not want them taken off and readjusted when he first informed Officer Fowler that he was in pain and his handcuffs needed to be readjusted.  Furthermore, Kisskalt asserts he did not and could not have known the request for photographs would take four minutes to complete.  As noted in the reply brief, however, this response by Kisskalt does not deny any portion of Officer Fowler's assertion or cite to any evidence to contradict the assertion.  Instead, Kisskalt attempts to explain his behavior which is irrelevant to the legal analysis.  Accordingly, this fact is deemed admitted in full.

Kisskalt's wrists with handcuffs removed; *see also* Ex. C, Friese Dep. at 15:25-16:11.)
Kisskalt testified that the red marks lasted for a couple of days and that he has no
scarring as a result of the handcuffs.  (Ex. B, Kisskalt Dep. at 102:18-22.)

Officer Fowler testified that after he took the handcuffs off, he asked Kisskalt if he
wanted any medical attention for his hands.  Kisskalt declined.  (Fowler Aff. ¶ 23.)
Before leaving the Lafayette Police Department, Officer Fowler also asked Kisskalt if his
wrists were all right.  Kisskalt said he was "fine".  (Ex. B, Kisskalt Dep. at 94:22-24;
Fowler Aff. ¶ 24.)  Upon arrival at the Boulder County Jail, Kisskalt was again asked if
he needed medical attention and responded, "I'm fine."  (Ex. B, *id.* at 100:8-10.)

As an accommodation prior to being transported to Boulder County Jail, Officer
Fowler handcuffed Kisskalt in front of his body in an effort for his hands to be more
comfortable.  (Fowler Aff., ¶ 25.)  While Kisskalt claims that this demonstrates that
Officer Fowler knew his wrists had been injured, this is unsupported argument.

Before leaving the Lafayette Police Department, Kisskalt alleges that Officer
Fowler shoved him against a wall.  (Ex. 1, Kisskalt Dep. at. 97:1-25.)  There was
something on the wall (spit-up or mucus), and Kisskalt testified that Officer Fowler
pressed or pushed his face towards the substance such that his face made contact with
the substance.  (*Id.*)[4]  While Officer Fowler denies that doing shoving or pushing
Kisskalt, he asserts that this is immaterial to Kisskalt's claim regarding handcuffs that
were too tight.  Further, he notes that Kisskalt alleges no injury related to this "shove".

---

[4] While Kisskalt alleges that this shove occurred because Officer Fowler was upset by his request
for photographs, he cites no evidence in support of that assertion.

Kisskalt did not complain to any Lafayette Police Officer about his wrists or being shoved up against a wall by Officer Fowler.  He also did not complain when he arrived at the Boulder County Jail.  Kisskalt states he did not complain because he assumed that the police would realize he was treated unfairly and because he "was afraid for [his] safety" if he spoke out against Officer Fowler.  (Ex. 1, Kisskalt Dep. at 91:9-22; 100:14-101:8.)  Nonetheless, regardless of his motivation, it is undisputed that Kisskalt did not complain about his treatment.

Kisskalt sought no medical treatment related to his left wrist until June 14, 2011, a month after the accident and while he was on vacation.  (Ex. B, Kisskalt Dep. at 107:11-15.)[5]  As part of that treatment, Kisskalt underwent testing for numbness in his left hand.  The results indicated that Kisskalt's nerve function was within normal range.  Kisskalt was diagnosed with mild ulnar neuropathy, was prescribed no treatment, and was placed on no restrictions.  (Ex. D,  Dr. Femminineo Dep. at 17:19-20:9; Exhibit B, Kisskalt Dep. at 109:3-111:5.)  Dr. Femminineo testified that Kisskalt's symptoms and test results indicate normal physiological function and that the prognosis for recovery was good.  (Ex. D, Dr. Femminineo Dep. at 19:13-14; 21:13-22:3.)   Kisskalt sought no further treatment after that, although he retained Dr. Bennett Machanic to do an Independent Medical Evaluation.  That evaluation is dated February 13, 2014.  (Ex. 7.)[6]

---

[5] Kisskalt does not deny this; instead, he makes only unsupported argument and legal conclusions in response.

[6] While Kisskalt asserts that he is seeing Dr. Machanic presently to explore treatment options, he does not cite to any evidence to support that assertion.

While Officer Fowler asserts that the wrist injury was benign, Kisskalt denies this. He asserts that the injury to his wrist affects him to this day, and that he is still experiencing pain and difficulty with his wrist.  (*See* Ex. 1, Kisskalt Dep. at 111:6-25.)[7] Kisskalt cites to Dr. Machanic's evaluation and deposition testimony, asserting that Dr. Machanic is "convinced" that Kisskalt experienced nerve damage because of the handcuffing incident and that Kisskalt's injury is "quite chronic."  (Ex. 6, Machanic Dep. at 41:8-14; Ex. 7, Dr. Machanic's Assessment at p. 2.)  Kisskalt's characterization of this evidence is, however, misleading.

While Dr. Machanic was "convinced that [Kisskalt has] got an ulnar nerve problem" (Ex. 6, Dr. Machanic Dep. at 41:13-14) and other problems with his left wrist/arm that were "quite chronic indeed" (Ex. 7 at p. 2), he did not attribute those injuries to the handcuff incident.  Officer Fowler is thus correct in noting that Kisskalt does not cite to evidence in the record beyond his allegations that his injury is attributable to the handcuffing during his arrest.  Further, Officer Fowler points out that Dr. Machanic's evaluation states that "the precise nature of what occurred at that time is not fully clear at this point, . . . not entirely clear at this point as to the extent of what is going on . . . ."  (Ex. 7, p. 2.)[8]  Dr. Machanic also testified that he could not comment

---

[7] While Kisskalt asserted in his response that this injury makes it painful and difficult to enjoy sports and hobbies, that he drops objects and fumbles when he tries to grasp objects with his left hand, and that his reflexes are slower, he cites no evidence to support those assertions.

[8] While Dr. Machanic did not precisely know the degree of severity of the nerve damage, "[a]t most, it would be moderate", not severe, but "it's not normal".  (*Id.* 41:8-14, 42:2-5, 42:22-43:1.)  Thus, while Officer Fowler asserts that Dr. Machanic made no specific diagnosis, that is not accurate. Dr. Machanic did indicate, however, that another EMG nerve conduction study was necessary to determine the status of the nerve (the extent and location of the current problem) and treatment options. (*Id.* at 40:12-41:7; Ex. 7 at p. 2.)

further beyond his clinical observations.  (Ex. 6, Dr. Machanic Dep. at 41:16-42:8.)

Further, he testified in response to a question as to whether the injury was preexisting:

> A.  "Well, all I can do is refer to history. The history talks about a singular
> event, slice in time, at the point where he was handcuffed.  That's
> supposedly the beginning of this.  What's evolved over the period of time
> is not entirely clear because, as I said, I don't have the optative numbers
> so I can't compare anything to the original studies done by
> Dr. Femminineo.

(Ex. 6, Dr. Machanic Dep. at 44:3-12.)

Kisskalt's symptoms of pain or numbness were in his pinky and ring fingers.  (Ex. B, Kisskalt Dep. at 111:12-19.)  Officer Fowler asserts that these symptoms are not the typical result of a handcuff injury, citing to Dr. Femminineo's testimony.  While Kisskalt denies this, pointing to Dr. Machanic's deposition testimony, that testimony does not address or dispute Dr. Femminineo's testimony on the issue.  Dr. Femminineo testified that the sensory symptoms from handcuffing injuries "are pretty distinct" and manifest with sensory complaints towards "the top of the hand, more towards the thumb and the index finger."  (Ex. D, Dr. Femminineo Dep. at 27:16-28:5; 30:4-13.)

III.   ANALYSIS

A.   Standard of Review

Summary judgment may be granted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the ... moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "A fact is 'material' if, under the governing law, it could have an effect on the outcome of the lawsuit."  *E.E.O.C. v.*

*Horizon/ CMS Healthcare Corp.*, 220 F.3d 1184, 1190 (10th Cir. 2000).  "A dispute over a material fact is 'genuine' if a rational jury could find in favor of the nonmoving party on the evidence presented."  *Id.*

The burden of showing that no genuine issue of material fact exists is borne by the moving party.  *Horizon/ CMS Healthcare Corp.*, 220 F.3d at 1190.  "'Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'"  *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000) (quotation omitted).  When applying the summary judgment standard, the court must "'view the evidence and draw all reasonable inferences therefrom in the light most favorable to the party opposing summary judgment.'"  *Id.* (quotation omitted).  All doubts must be resolved in favor of the existence of triable issues of fact.  *Boren v. Southwestern Bell Tel. Co.*, 933 F.2d 891, 892 (10th Cir. 1991).

B.     The Merits of Defendant's Motion

Officer Fowler argues that he is entitled to the protection of qualified immunity under the allegations and law of this case.  Qualified immunity "is an immunity from suit rather than a mere defense to liability".  *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

When, as here, "'defendant asserts quaffed immunity at summary judgment, the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established.'" *Thomson v. Salt Lake Cnty.*, 584 F.3d 1304, 1312 (10th Cir. 2009) (quoting *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009)).  Thus, "'[q]ualified immunity is applicable unless the official's conduct violated a clearly established constitutional right.'" *Id.* (quoting *Pierson v. Callahan*, 555 U.S. 223, 129 S. Ct. 808, 816 (2009)).  The court has "the freedom to decide 'which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.'" *Lundstrom v. Romero*, 616 F.3d 1108, 1118 (10th Cir. 2010) (quoting *Pearson,* 129 S. Ct. at 818).

In determining whether the plaintiff has met his burden of establishing a constitutional violation that was clearly established, the court construes the facts in the light most favorable to the plaintiff as the nonmoving party.  *Thomson*, 584 F.3d at 1312. "A right is clearly established . . . 'when a Supreme Court or Tenth Circuit decision is on point, or if the clearly established weight of authority from other courts shows that the right must be as the plaintiff maintains.'" *Thomas v. Kaven*, 765 F.3d 1183, 1194 (quotation and internal quotation marks omitted).  "A previous decision need not be 'materially factually similar or identical to the present case; instead, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Id.* (quotation and internal quotations marks and alterations omitted).  "'The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was

-14-

unlawful in the situation he confronted.'" *Id.* at 1194 (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)).

In the case at hand, I first address Kisskalt's claim of excessive force relating to the handcuffs. "An officer using force in the course of a seizure of a citizen is entitled to qualified immunity unless the level of force violated clearly established Fourth Amendment law.'" *Thomson,* 584 F.3d at 1313. The question is "'whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.'" *Id.* (quoting *Graham v. Connor*, 490 U.S. 386. 397 (1989) (internal quotation marks omitted)). "Reasonableness is evaluated under a totality of the circumstances approach, which requires that [the court] consider and balance the following factors: 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Id.* (quoting *id.* at 396).

Kisskalt admits in his response brief, and I agree, that being arrested on suspicion of drunk driving justified the initial use of handcuffs on him. *See* Pl.'s Resp. to Def.'s Mot. Summ. J. at 14; *see also Fisher v. City of Las Cruces*, 584 F.3d 888, 896 (10th Cir. 2009) ("in nearly every situation where an arrest is authorized, . . . handcuffing is appropropriate"); *Silvan W. v. Briggs*, 309 F. App'x 216, 224 (10th Cir. 2009) (handcuffing peaceful arrestee for minor crime and detaining him for over an hour was not excessive). Thus, the issue becomes whether Officer Fowler violated a

constitutional right by using excessive force in connection with making the handcuffs too tight and/or by failing to adjust the handcuffs after Kisskalt complained.

The Tenth Circuit has recognized that "unduly tight handcuffing can constitute excessive force where a plaintiff alleges some actual injury from the handcuffing and alleges that an officer ignored a plaintiff's timely complaints (or was otherwise made aware) that the handcuffs were too tight." *Cortez v. McCauley*, 478 F.3d 1108, 1129 (10th Cir. 2007). The actual injury must be "caused by the unreasonable seizure" and must not be "*de minimis*". *Fisher*, 584 F.3d at 897.[9]

Even construing the evidence in the light most favorable to Kisskalt, I find that he has not shown the violation of a constitutional right under the above test. While Kisskalt has presented evidence that Officer Kisskalt ignored his complaints that the handcuffs were too tight and that he has an injury to his left wrist/arm, he has not shown more than a *de minimis* injury. Indeed, when the handcuffs were removed, Kisskalt advised both Officer Fowler and Boulder County Jail officials that he was fine and did not need medical treatment for his wrists. Further, he did not seek treatment for the injury until one month after his arrest, and Dr. Femmineo found at that time after performing nerve testing that Kisskalt only had a mild left ulnar neuropathy with a good prognosis

---

[9] As noted in the concurring opinion in *Fisher*, the Tenth Circuit created this test because police officers almost always use handcuffs and, therefore, the *Graham* factors offer little guidance in tight handcuff cases. 584 F.3d at 902 n. 1 (Gorsuch J., concurring). Thus, a look at the extent of an injury claimed by the plaintiff fills "a small analytical void that *Graham* left open," and helps to identify when an otherwise lawful application of handcuffs constitutes force that a reasonable jury could find rises to the level of excessive force because an officer applied handcuffs too tightly. *Id.* at 902.

and that Kisskalt's nerves were operating within normal functional range.[10]   That is the

only opinion of a treating physician in the record.  Dr. Machanic is Plaintiff's retained

expert.

Even if the injury was more than *de minimis*, neither Dr. Femminineo nor

Dr. Machanic rendered an opinion on the issue of causation—that the handcuffing

actually caused the damage.  Indeed, as discussed in Section II, *supra*, Dr. Machanic

was asked in his deposition whether he could determine if the injury was preexisting and

he responded that he could only refer to the history provided by Kisskalt related to the

handcuffing, which was "*supposedly* the beginning of this."  He also stated that "[w]hat's

evolved over the period of time is not entirely clear because, as I said, I don't have the

optative numbers so I can't compare anything to the original studies done by

Dr. Femminineo."  (Ex. 6, Dr. Machanic Dep. at 44:3-12.)  Moreover, Dr. Femminineo

testified that there could be a number of causes for the type of injury sustained by

Kisskalt.  (Ex. D, Dr. Femminineo Dep. at 22:12-23:10.)  Finally, the symptoms that

Kisskalt complained of in connection with his pinkie and ring finger are not those

commonly attributed to a handcuff injury, as testified to by Dr. Femminineo.

I also find that Kisskalt has not met his burden of showing that the constitutional

right was clearly established.  He has not pointed to Supreme Court or Tenth Circuit

precedent (or the clear weight of other circuit courts) that recognizes an actionable

---

[10] I further note that  Dr. Femminineo testified that a person with severe nerve involvement, who is complaining about being unable to grasp or handle objects because of the loss of sensation, would have a "phenomenon of denervation", with "weakness patterns that correlate with that".  (Ex. D, Dr. Femminineo Dep. at 28:7-16.)  He did not see signs of denervation in Kisskalt, which "suggest[ed] that his symptoms were primarily sensory and there was no significant weakness pattern that would be correlated with that degree of ulnar neuropathy that I saw."  (*Id.* at 30:4-13.)

constitutional violation in a similar circumstance.[11]  While "a factually identical case is not required, . . .'it must still be apparent to a reasonable officer in light of pre-existing law that his conduct was unlawful.'"  *White v. Martin*, 425 F. App'x 736, 744 (10th Cir. 2011) (quoting *Thomas*, 607 F.3d at 669).  I find that Kisskalt has not cited to authority that would have put a reasonable officer on notice that the conduct at issue (leaving handcuffs on an arrestee complaining that the handcuffs were too tight for a total of ten minutes, four of which was due to Kisskalt's insistence on photographs) was a clearly established violation of the Fourth Amendment.

Indeed, the Tenth Circuit has held that no claim for excessive force existed even though a plaintiff was handcuffed behind the back and remained handcuffed for 20 minutes, complained repeatedly that the handcuffs were too tight and of pain, and suffered damage to her shoulder and her radial nerve at the wrist which prevented her from pursuing her professional and recreational piano playing.  *Morreale v. City of Cripple Creek*, No. 96-1220, 1997 WL 290976, at *1 (10th Cir. 1997).  This is because it was undisputed that the officer took steps to assure that the handcuffs were not too tight"—in that case by verifying "that two fingers' space remained inside the handcuffs so that blood circulation would not be cut off" and double locking "the handcuffs so they would not tighten down."  *Id.* at *1, 5.  Officer Fowler took similar steps in this case.  *See*

---

[11] Because the existence of excessive force is a fact-specific inquiry, "there will almost never be a previously published opinion involving exactly the same circumstances."  *Casey v. City of Federal Heights*, 509 F.3d 1278, 1284 (10th Cir. 2007).  Indeed, "'officials can still be on notice that their conduct violates established law even in novel factual circumstances.'"  *Id.* (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).  Thus, the Tenth Circuit has adopted a sliding scale.  "'The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation."  *Id.* (quoting *Pierce v. Gilchrist*, 359 F.3d 1279, 1298 (10th Cir. 2004)).

*also Lewis v. Sandoval*, 428 Fed. App'x 808, 811-12 (10th Cir. 2011) (officer's actions found to be reasonable under the circumstances where suspect did not complain of any discomfort until arrival at the police department and where officer checked that he could insert his fingertip between suspect's wrist and the handcuffs and ultimately removed the cuffs within ten minutes of suspect's complaint).

The cases cited by Kisskalt are distinguishable.  Thus, In *Vondrak v. Las Cruces*, 535 F.3d 1198, 1209 (10th Cir. 2008), the plaintiff immediately complained that the handcuffs were too tight when they were clamped on, and complained a half dozen more times while on the way to the police station.  He also made several requests at the police station for someone to loosen his handcuffs because his wrists were hurting, but the officers ignored him.  *Id.*  Moreover, the plaintiff's neurologist diagnosed him with permanent nerve injury in his wrists, and concluded that the "'handcuffing was the competent producing cause'" of his injury.  *Id.* (quotation omitted).

Similarly, in *Cardenas v. Fisher*, 307 F. App'x 122, 123 (10th Cir. 2009), the plaintiff immediately felt pain after being put in handcuffs, and indicated he "was in physical discomfort on his whole left side, from his shoulder to his lower back, while in the squad car and at the jail." *Id.* at 123-24.  Despite repeated complaints about the handcuffs' tightness, the defendant officer refused to loosen them.  *Id.* at 124.  When the handcuffs were ultimately removed at the police station, another officer observed that "[t]he handcuffs were extremely, extremely tight."  *Id.* at 124. The record indicated that Cardenas sought medical treatment for his injuries a week or two after the incident and that he maintained he was unable to work for approximately two months.  *Id.*

Here, in contrast, Kisskalt did not complain immediately upon handcuffing. When he made his complaints, the police department was only two to three minutes away, and Officer Fowler's decision to continue to the police department was based on his understanding that pulling over immediately upon Kisskalt's complaint would have resulted in potentially significant delay, certainly a delay longer than two minutes. Further, upon arrival at the police department, approximately three minutes later, Officer Fowler immediately attempted to remove the handcuffs, but Kisskalt wanted to wait until photographs were taken. At most, Kisskalt was in handcuffs for ten minutes, and even at that time Officer Fowler was able to insert a finger between the handcuffs and Kisskalt's wrist. Kisskalt did not seek medical treatment for a month, and was diagnosed by that doctor with only a mild injury. No doctors have opined that the handcuffing was the cause of the injury. Based on the foregoing, I find that Officer Fowler is entitled to qualified immunity as to the claim regarding Kisskalt's handcuffing.[12]

I also find that Kisskalt did not establish a constitutional violation in connection with his allegation that Officer Fowler used excessive force in shoving him against a wall and pushing his face towards spit-up or mucus. Kisskalt did not "show an actual, non-deminimis injury that occurred in connection with this allegation of excessive force, as required. T*ooley v. Young*, 560 F. App'x 797, 801 (10th Cir. 2014) (quoting *Koch*,

---

[12] Also, the *Cortez* case and *Koch v. City of Del City*, 660 F.3d 1228 (10th Cir. 2011) provide no support for Kisskalt, as the facts regarding the handcuffing were not discussed and the court dismissed the claims because the plaintiff did not show an actual injury that was not de minimis. *Cortez*, 478 F.3d at 1129; *Koch*, 660 F.3d at 1247-48. Finally, *Fisher* is inapposite as the plaintiff was not contesting the tightness of handcuffs; instead, he asserted that the manner of his handcuffing "forcibly behind his back"—"with a knee to his back, placing pressure on his stomach wound, and with his arms brought behind his body"— was excessive and caused him pain. *Id.* at 893-96.

660 F.3d at 1247-48).  Accordingly, Officer Fowler is also entitled to qualified immunity

on this claim.

IV.     <u>CONCLUSION</u>

Based upon the foregoing, it is

ORDERED that Defendant's Motion for Summary Judgment (ECF No. 144) is

**GRANTED**.  Judgment shall enter in favor of Defendant and against Plaintiff.  It is

FURTHER ORDERED that the three-day jury trial set to commence on Tuesday,

January 20, 2015, and the Final Trial Preparation Conference set on Wednesday,

January 7, 2015, at 10:00 a.m. are **VACATED**.

Dated:  November 21, 2014

BY THE COURT:


s/ Wiley Y. Daniel
Wiley Y. Daniel
Senior United States District Judge